[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 03-13671
_____

D.C. Docket No. 98-02651-CV-WPD

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 23, 2006
THOMAS K. KAHN
CLERK

CBS BROADCASTING, INCORPORATED,
FOX BROADCASTING COMPANY,

Plaintiffs-Counter-Defendants-Appellees,

FBC TELEVISION AFFILIATES ASSOCIATION,
ABC TELEVISION AFFILIATES ASSOCIATION,
NBC TELEVISION AFFILIATES,
CBS TELEVISION AFFILIATES ASSOCIATION,

Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants,

ABC, INC.,

Plaintiff,

NATIONAL BROADCASTING COMPANY,

Plaintiff-Counter-Defendant,

versus

ECHOSTAR COMMUNICATIONS CORPORATION,

dba DISH Network,
ECHOSTAR SATELLITE CORPORATION,
SATELLITE COMMUNICATIONS OPERATING CORPORATION,
DIRECT SAT CORP.,

Defendants-Counter-Claimants-Appellants-Cross-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

**(May 23, 2006)**

Before TJOFLAT and HILL, Circuit Judges, and MILLS[*], District Judge.

TJOFLAT, Circuit Judge:

The Satellite Home Viewer Act of 1988 ("SHVA"), Pub. L. No. 100-667, tit. II, 102 Stat. 3935 (codified as amended at 17 U.S.C. § 119), as amended by the Satellite Home Viewer Improvement Act of 1999 ("SHVIA") (collectively, the "Act"), Pub. L. No. 106-113, § 1001 et seq., 113 Stat. 1501, 1501A-523, gives satellite carriers a compulsory, statutory license to transmit copyrighted distant network programing[1] to "unserved households," that is, households unable to

---

[*] Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

[1] "Distant network signals are network stations from outside a subscriber's market area. For example, a person who lives in Fort Lauderdale but receives an ABC, CBS, Fox or NBC network station from New York City is receiving 'distant network programming' or 'distant network stations.'" CBS Broad., Inc. v. Echostar Commc'ns Corp., 276 F. Supp. 2d 1237, 1241

2

receive network programing at a specified level of intensity through the use of conventional rooftop antennas.[2] This case involves claims by network stations, CBS Broadcasting, Inc. ("CBS") and Fox Broadcasting Company ("Fox"), and network affiliate associations, ABC Television Affiliates Association, CBS Television Network Affiliates Association, FBC Television Association, and NBC Television Affiliates Association (collectively, "networks"),[3] that defendant EchoStar, a satellite carrier doing business as DISH Network,[4] is retransmitting their programs to "served" households and thereby infringing their exclusive right, under the Copyright Act, to control the retransmission of their programs.

In <u>CBS Broadcasting, Inc. v. Echostar Communications Corp.</u>, 265 F.3d

---

(S.D. Fla. 2003).

[2] In its report, the House Committee on Energy and Commerce stated that it "believes that this approach will satisfy the public interest in making available network programming in these (typically rural) areas, while also respecting the public interest in protecting the network-affiliate distribution system." H.R. Rep. No. 100-887(II), at 19-20 (1988), <u>reprinted in</u> 1988 U.S.C.C.A.N. 5577, 5648. <u>See also</u> <u>ABC, Inc. v. PrimeTime 24 Joint Venture</u>, 184 F.3d 348, 350-51 (4th Cir. 1999); <u>CBS Broad., Inc. v. PrimeTime 24 Joint Venture</u>, 48 F. Supp. 2d 1342, 1355 (S.D. Fla. 1998).

[3] The Affiliate Associations are voluntary membership trade associations comprised of network stations that are affiliates with the respective networks. Plaintiffs ABC, Inc. ("ABC") and National Broadcasting Company, Inc. ("NBC") were dismissed and are no longer parties to the case.

[4] As of April 2002, EchoStar provided satellite television services to over nine million Americans, including both local network subscribers under the compulsory license in 17 U.S.C. § 122, and distant network subscribers under the Act. EchoStar provided distant network programming to about 1.2 million subscribers.

1193 (11th Cir. 2001) (EchoStar I), we vacated the district court's preliminary injunction upholding the networks' claims and ordering EchoStar to cease transmitting the programs to "served households," id. at 1193, and remanded the case to the district court for a trial on the networks' application for injunctive relief pursuant to the Act.  On remand, the district court found at the conclusion of the bench trial that EchoStar had not satisfied its statutory burden of proving that the households at issue were unserved.  CBS Broad., Inc. v. Echostar Commc'ns Corp., 276 F. Supp. 2d 1237, 1248 (S.D. Fla. 2003).  In fact, in the district court's judgment, the evidence indicated that EchoStar had been retransmitting the networks' programs to thousands of served households.  Id. at 1253-54.  Given these findings, the networks asked the court permanently to enjoin EchoStar from any use of the Act's statutory license for distant network programing.  The court denied their request, and instead issued an injunction ordering EchoStar to use a different method for determining whether its subscribers are unserved households. Id. at 1254-55.[5]  EchoStar now appeals the court's injunctive order and its grant of summary judgment on EchoStar's counterclaims.  The networks cross-appeal, contending that the district court was required as a matter of law permanently to

_____

[5] In addition to prescribing a method for determining subscriber eligibility, the court held that none of EchoStar's current subscribers were eligible for grandfather status pursuant to 17 U.S.C. § 119(e).  CBS Broad., Inc., 276 F. Supp. 2d at 1257.

4

enjoin the carrier from using the statutory license.

We organize this opinion as follows. In Part I, we explain the statutory licensing scheme the Act created and the burden of proof a satellite carrier must satisfy to permit the court to find that the subscribers at issue are eligible to receive distant network programming. In Part II, we review how the trial proceeded, the district court's findings of fact, and is legal conclusions. In Part III, we address both EchoStar's and the networks' claims of error. Despite reversing the district court's determination that EchoStar's use of two vendors was unlawful, we affirm on the remainder of EchoStar's claims and the court's conclusion that EchoStar engaged in a "willful or repeated" violation of the Act. We also hold that the court erred in not finding a "willful or repeated pattern or practice" of statutory violations, and in not barring EchoStar from further use of the license. In Part IV we briefly conclude.

## I.

The scheme the Act created is set out in considerable detail in EchoStar I. We reiterate what was said there only to set the stage for the discussion that follows.

As noted, SHVA created a compulsory, statutory license for satellite carriers to retransmit copyrighted network programming ("secondary transmission") for

private home viewing to "persons who reside in unserved households." 17 U.S.C.

119(a)(2)(B)(i).[6] SHVIA defines "unserved households" by dividing them into

five categories, the first three of which are pertinent here:

> 1. Households that "cannot receive, through use of conventional, stationary, outdoor rooftop receiving antenna, an over-the-air signal of a primary network station affiliated with that network of Grade B intensity as defined by the Federal Communications Commission under section 73.683(a) of title 47 of the Code of Federal Regulations, as in effect on January 1, 1999." Id. § 119(d)(10)(A).

> 2. Households that receive a waiver from each network station affiliated with a particular network that is predicted to deliver a Grade B or better signal to the subscriber's residence. Id. § 119(d)(10)(B), (a)(14), (a)(2)(B).

> 3. Households that (a) receive a signal of less than Grade A intensity for a particular network and (b) received satellite service of that network's signals on October 31, 1999 or had such service terminated for SHVA ineligibility between July 11, 1998 and October 31, 1999 ("grandfathered

---

[6] Subject to provisions not relevant here, SHVA as amended, states that
(A) In general.– . . . [S]econdary transmissions [i.e., retransmissions] of a performance or display of a work embodied in a primary transmission made by a network station shall be subject to statutory licensing under this section if the secondary transmission is made by a satellite carrier to the public for private home viewing, with regard to secondary transmissions the satellite carrier is in compliance with the rules, regulations, or authorizations of the Federal Communications Commission governing the carriage of television broadcast station signals, and the carrier makes a direct or indirect charge for such retransmission service to each subscriber receiving the secondary transmission.
(B) Secondary transmissions to unserved households.–
(i) In general.– The statutory license provided for in subparagraph (A) shall be limited to secondary transmissions of the signals of no more than two network stations in a single day for each television network to persons who reside in unserved households.
17 U.S.C. §§ 119(a)(2)(A), (B)(i). SHVA's definition of "unserved households" was altered by the SHVIA amendment. The amended definition is controlling in this case.

6

subscribers"). Id. §§ 119(d)(10)(c), (e).[7]

Anticipating that litigation would ensue over whether households are served or unserved, Congress, as part of the SHVIA amendment, instructed that the courts may use two methods to resolve the issue: the "Accurate measurements" method and the "Accurate predictive model." The "Accurate measurements" method requires actual physical measurements to determine the strength of the television station's signal at the subscriber's residence. Id. § 119(a)(2)(B)(ii)(II). These measurements must follow the procedures elaborated in 47 U.S.C. § 339 and 47 C.F.R. § 73.686, including measuring the signal intensity at a "minimum of five locations as close as possible to the specific site where the site's receiving antenna is located." 47 C.F.R. § 73.686(d)(1)(ii). The "Accurate predictive model" for determining signal intensity is "the Individual Location Longley-Rice [ILLR] model set forth by the Federal Communications Commission." 17 U.S.C. § 119(a)(2)(B)(ii)(I).[8] If used, the ILLR model permits the satellite carrier to

_____

[7] The fourth and fifth categories are:
4. Subscribers who receive distant signals through a satellite dish located on a commercial truck or recreational vehicle, and who satisfy the strict statutory documentation requirements. Id. § 119(d)(10)(D), (a)(12).
5. Subscribers who receive "secondary transmissions by C-band services of network stations that [the subscriber] received before any termination of such secondary transmissions before October 31, 1999." Id. § 119(d)(10)(E), (a)(2)(B)(iii).

[8] Prior to the SHVIA amendment, SHVA limited the statutory licence to "secondary transmissions to persons who reside in unserved households," 17 U.S.C.A § 119(a)(2)(B) (West, Westlaw through November 28, 1999 amendments), but did not set out specific ways in which a

avoid having to make time-consuming physical measurements of the signal intensity at a subscriber's residence by allowing the carrier to establish presumptively that a household cannot receive at least a Grade B signal and is therefore unserved. See 17 U.S.C. § 119(a)(2)(B)(ii)(I); EchoStar I, 265 F.3d at 1200. But ILLR determinations are nothing more than presumptive – eligibility is ultimately based on the signal strength a household actually receives, as measured by on-site testing. See 17 U.S.C. § 119(a)(2)(B)(ii)(I) (indicating that the ILLR model is to be used "[i]n determining presumptively whether a person resides in an unserved household"); H.R. Rep. 106-464, at 97 (1999) (Conf. Rep.) (Joint Explanatory Statement of the Committee of Conference) ("[C]ourts should rely on the FCC's ILLR model to presumptively determine whether a household is capable of receiving a signal of Grade B intensity. . . . [T]he ultimate determination of eligibility to receive network signals shall be a signal intensity test pursuant to 47 C.F.R. § 73.686(d), as reflected in new section 339(c)(5) of the Communications Act of 1934.").

The Act makes abundantly clear that it is the satellite carrier who bears the burden of proving that its subscribers are, in fact, unserved. 17 U.S.C. §

---

satellite carrier could demonstrate whether a household was unserved. The FCC adopted ILLR as a method for determining signal strength in February 1999. See EchoStar I, 265 F.3d at 1204.

119(a)(7)(D).[9] Plaintiff network stations have no obligation to put on any evidence demonstrating a violation of the terms of the statutory license. To the extent networks put on affirmative evidence of ineligibility, a satellite carrier cannot simply rebut or impeach that evidence. The satellite carrier must provide additional evidence that its challenged subscribers are unserved. Thus, a satellite carrier may be found to have violated the Act even if a court does not find that its subscribers are "served." A violation occurs so long as a carrier does not satisfy its burden of proving that its subscribers are "unserved."

The Act contemplates two categories of violations as it relates to the secondary transmission of distant network service to served households: "Individual violations" and "Pattern[s] of violations." An "Individual violation" occurs where there is a "willful or repeated secondary transmission . . . to a subscriber who is not eligible to receive the transmission under this section." Id. § 119(a)(7)(A). A district court has broad discretion to remedy such violation(s). See id.; id. §§ 502-506, 509. A "Pattern of violations" arises where "a satellite carrier engages in a willful or repeated pattern or practice of delivering [distant

---

[9] This provision states:
Burden of proof.– In any action brought under this paragraph, the satellite carrier shall have the burden of proving that its secondary transmission of a primary transmission by a network station is to a subscriber who is eligible to receive the secondary transmission under this section.
17 U.S.C. § 119(a)(7)(D).

9

network service] to subscribers who are not eligible to receive the transmission under this section." Id. § 119(a)(7)(B). The Act grants a court no discretion in its choice of remedy for a "pattern or practice" of violations.[10] Upon finding such a "pattern or practice," the Act instructs that "the court shall order a permanent injunction barring the secondary transmission by the satellite carrier, for private home viewing, of the primary transmissions of any primary network station affiliated with the same network, and the court may order statutory damages of not to exceed $250,000 for each 6-month period during which the pattern or practice was carried out." Id. § 119(a)(7)(B)(i).[11]

## II.

Despite not having the burden of proof at trial, plaintiffs presented affirmative evidence, in the form of expert testimony from Jules Cohen as well as ILLR analyses of EchoStar's subscribers at various points in time, tending to demonstrate that EchoStar has provided, and continues to provide, distant network service to ineligible households. EchoStar responded with the testimony of

---

[10] EchoStar contends that courts retain their traditional equitable discretion regardless of the Act's explicit limitations. As we discuss infra, we disagree.

[11] The scope of the permanent injunction depends on the scope of the "pattern or practice" of violations. Where the "pattern or practice" has been carried out a "substantially nationwide basis," the Act mandates a nationwide injunction. See 17 U.S.C. § 119(a)(7)(B)(i). A local or regional "pattern or practice" results in a permanent injunction limited to "that locality or region." See id. § 119(a)(7)(B)(ii).

company executives, as well as that of Dr. Charles Jackson, an expert whose testimony was intended to criticize plaintiffs' expert testimony and who the court determined lacked credibility. CBS Broad. Inc., 276 F. Supp. 2d at 1244, 1252 n.10. The court specifically and correctly noted that merely impeaching the plaintiffs' affirmative evidence would be insufficient given defendant's statutory burden. Id. at 1244. After evaluating the evidence presented by the parties, the court made the following findings of fact and conclusions of law.[12]

## A. District Court's Findings of Fact

### 1. EchoStar's History of Compliance Procedures

From March 1996 to July 1998, EchoStar offered distant network programming through an agreement with another satellite provider, PrimeTime 24 Joint Venture. PrimeTime 24 utilized a subjective method of determining subscriber eligibility based simply on a potential subscriber's qualitative evaluation of her television signal. In 1998, the United States District Court for the Southern District of Florida issued a preliminary, then a permanent injunction requiring PrimeTime 24 to terminate the delivery of distant network signals to subscribers who had been signed up using this subjective method. Days after the entry of the injunction, EchoStar terminated its agreement with PrimeTime 24 and

_____

[12] We summarize only those findings that are relevant to this appeal.

canceled its subscribers' PrimeTime 24 distant network programming packages. EchoStar then switched virtually all subscribers to new, EchoStar-designed distant network programming packages.

After EchoStar terminated its relationship with PrimeTime 24, it began evaluating new-subscriber eligibility through a system referred to as the "red-light/green-light method." Under this system, each zip code was designated as either a red-light or a green-light zip code based on predicted signal strength. A household in a red-light area was presumptively ineligible for service. EchoStar claims that it refused to sign up subscribers who lived in red-light zip codes unless the subscribers obtained a valid waiver from the network station. The district court found, however, that EchoStar presented no real evidence that its determination of whether zip codes were red-light or green-light areas was reasonably calculated to prevent signups of ineligible subscribers. Additionally, the court found that EchoStar's customer service representatives were able to override the red-light/green-light designations – that is, even if a subscriber was in a red-light zip code, a customer service representative still had discretion to sign up that subscriber for distant network programming.

EchoStar began using the ILLR model to determine subscriber eligibility in 1999. Echostar's ILLR methodology involved the following three relevant

factors: First, until October 2000, EchoStar utilized a "DMA Rule" by which it only used the ILLR model to consider the signal strength of network stations in a given household's Nielsen-defined designated market area ("DMA"). In other words, even if a household received a Grade B or higher signal from network stations outside a household's DMA, EchoStar would consider it potentially unserved. Additionally, EchoStar included interference in its ILLR analyses until January 2002.[13] Finally, EchoStar utilized (and continues to use) two vendors – Decisionmark and Dataworld – for its ILLR analysis. So long as one model indicates that a household cannot receive a Grade B signal, EchoStar considers the household to be unserved.[14]

The district court found that recently, EchoStar has taken significant measures to ensure compliance with the Act. Customer service representatives are trained and are no longer able to override system determinations of subscriber ineligibility. Additionally, EchoStar uses a backup compliance system and, on a monthly basis, reanalyzes all new subscribers to ensure eligibility. EchoStar terminates distant network programming to any subscribers found to be ineligible.

---

[13] Incorporating interference in the ILLR analysis can potentially result in weaker predicted signal strength as the model would then factor in the predicted presence of interfering signals from other stations.

[14] The two vendors might differ in their ILLR output as a result of database inaccuracies. CBS Broad. Inc., 276 F. Supp. 2d at 1250.

## 2. Analysis of EchoStar's Subscriber Base

Plaintiffs presented analyses of EchoStar subscriber lists at different points in time. The analyses were supervised and explained by plaintiffs' expert witness, Jules Cohen.

### a. PrimeTime 24 Subscribers

In an effort to dissuade the district court from issuing the original injunction in this case, EchoStar's CEO, Charles Ergen, made a formal pledge under penalty of perjury in September 1999. In that pledge, he promised that for each of the subscribers that had originally been signed up for EchoStar's distant network programming using the subjective PrimeTime 24 method, EchoStar would (1) determine if they were served or unserved using the ILLR method; and (2) terminate all ineligible subscribers. To comply with this promise, EchoStar submitted a list of its 331,586 PrimeTime 24 subscribers to Decisionmark, an ILLR vendor, for an ILLR analysis. EchoStar received the analysis the following month.

The analysis revealed that of the 331,586 total subscribers signed up for distant network programming with EchoStar pursuant to the agreement with PrimeTime 24, the percentages of Grade A subscribers were 61% (ABC), 60%

14

(CBS), 58% (Fox), and 60% (NBC).[15]  These totals amount to more than 258,000 former PrimeTime 24 subscribers (approximately 78% of the total) who were predicted to receive a Grade A signal from at least one of the four networks. Contrary to Ergen's promise, the district court found no evidence that EchoStar terminated service to <u>any</u> of these subscribers for compliance-related purposes. <u>CBS Broad., Inc.</u>, 276 F. Supp. 2d at 1245-46.

b. Red-Light/Green-Light Subscribers

The district court found that during the period EchoStar utilized the red-light/green-light methodology, it signed up a substantial number of subscribers in the ineligible red-light zip codes.  For example, between November 1988 and March 1999 EchoStar signed up 62,374 red-light subscribers for CBS distant network programming and 63,979 red-light subscribers for Fox distant network programming.  An ILLR analysis of this group of subscribers shows that 167,000 are predicted to receive a Grade B or better signal.[16]  Of the CBS distant programming subscribers signed up during this period, 69% were predicted to

---

[15] We believe it is worth re-emphasizing: An unserved household is one that cannot receive a Grade B signal, let alone the stronger Grade A variety.  17 U.S.C. § 119(d)(10)(A). Subscribers receiving a Grade A signal are not even eligible for grandfather status pursuant to section 119(e).

[16] EchoStar objects to an ILLR analysis of subscribers signed up before the ILLR methodology was incorporated into the Act via the SHVIA amendment as an impermissible retroactive application of the amendment.  As discussed, <u>infra</u>, we disagree.

receive a Grade B signal and 41% were predicted to receive a Grade A signal.  Id. at 1242.

### c. September 1999 Subscriber List

Along with its submission of PrimeTime 24 subscribers, EchoStar submitted a list of all of its distant network receiving subscribers as of September 1999.  The results were no more encouraging.  Of its 879,808 distant network subscribers, 53% were predicted to receive a Grade A signal for ABC, 51% for CBS, 48% for Fox and 52% for NBC.  An additional 18% for ABC, 21% for CBS, 12% for Fox, and 27% for NBC were predicted to receive a Grade B signal.  As of September 1999, 72% of EchoStar's distant network subscribers (630,000 subscribers), regardless of the compliance method used to enroll them, were predicted to receive a Grade A signal from at least one of the four networks. The district court found no evidence that EchoStar, despite receiving the analysis in October 1999, terminated any of the 630,000 Grade A subscribers for compliance reasons.  Id. at 1245.

### d. April 2002 Subscriber List

During the course of pre-trial discovery, EchoStar provided the plaintiffs with a list of its subscribers as of April 25, 2002.  Plaintiffs submitted the list for ILLR analysis under Cohen's supervision.  This analysis showed that hundreds of

thousands of EchoStar's distant network programming subscribers are predicted to receive signals of Grade A or B.  Of the 898,847 ABC subscribers, 50.9% (457,584) were predicted to receive a Grade B or better signal from an ABC station; 28.5% (255,980) of those were Grade A.  Of the 864,494 CBS subscribers, 55.7% (481,659) were predicted to receive a Grade B or better signal from a CBS station; 28.2% (244,022) of those were Grade A.  Of the 993,490 Fox subscribers, 38.7% (383,987) were predicted to receive a Grade B or better signal from a Fox station; 25.8% (256,741) of those were Grade A.  Of the 867,240 NBC subscribers, 56.4% (489,315) were predicted to receive a Grade B or better signal from an NBC station; 29.6% (256,503) of those were Grade A.  Id. at 1243.[17]

## B. Conclusions of Law[18]

---

[17] The court also considered the impact that grandfather status and waivers might have on the analysis assuming that all of EchoStar's claims to such subscriber eligibility were valid.  This analysis revealed more of the same: Of the 898,847 ABC subscribers, 26.5% (238,048) were predicted to receive a Grade B or better signal from an ABC station; 18.3% (164,409) of those were Grade A.  Of the 864,494 CBS subscribers, 26.9% (232,699) were predicted to receive a Grade B or better signal from a CBS station; 17.6% (152,140) of those were Grade A.  Of the 993,490 Fox subscribers, 20.2% (200,422) were predicted to receive a Grade B or better signal from a Fox station; 15.8% (156,906) of those were Grade A.  Of the 867,240 NBC subscribers, 28.1% (243,342) were predicted to receive a Grade B or better signal from an NBC station; 18.8% (163,011) of those were Grade A.  CBS Broad., Inc., 276 F. Supp. 2d at 1244.

[18] Prior to trial, in an order dated March 24, 2003, the district court granted summary judgment on EchoStar's counterclaims.  EchoStar had sued alleging tortious interference, unfair competition, and conspiracy to commit tortious interference and unfair competition based on statements made by plaintiffs, plaintiffs' counsel, local network affiliates and the National Association of Broadcasters.  The court concluded that, based on Florida law – which both parties agreed should apply – "EchoStar has failed to present evidence that raises a general [sic]

17

The district court concluded that "EchoStar has failed to meet its burden of proving that its subscribers are 'unserved households,'" within the meaning of the Act. Id. at 1248.[19] The court noted that, after a trial in which EchoStar presented no ILLR analysis or on-site signal intensity measurements, EchoStar had failed to prove that any of its subscribers cannot receive a network signal of at least Grade B strength. Id. Moreover, the court found fault with EchoStar's ILLR methodology. Id. at 1249-50. First it found the "DMA Rule" to be an improper method to ensure compliance with the Act. Additionally, it found that EchoStar's use of interference in its ILLR model, from May 2000 to January 2002, was improper.[20] Finally, the court found that EchoStar's past and present use of two

issue of material fact that would establish that Plaintiffs possessed the requisite intent and that EchoStar was harmed by the statements at issue." Order at 8.

[19] The court fluctuated in its conclusions as to whether it found that EchoStar had in fact provided service to ineligible households or that EchoStar had failed to satisfy its burden of demonstrating that its subscribers were unserved. Compare id. at 1253 ("EchoStar has failed to present credible evidence, either in the form of an ILLR analysis or signal intensity measurements, that any of its subscribers are unserved as defined under SHVA.") with id. at 1248-49 ("Mr. Cohen's testimony and reports . . . support the conclusion that hundreds of thousands of EchoStar's distant network programming subscribers are not unserved households."); id. at 1252 ("EchoStar has provided service to a large number of subscribers who have been incorrectly issued grandfather status."). As we discuss, infra, the distinction is immaterial in this context. Both conclusions are equivalent violations of the statute.

[20] In May 2000, the FCC issued a First Report and Order and published a "cookbook" describing how the ILLR model is to be employed. The May 2000 publications eliminated interference as a factor to be included in the model. CBS Broad., Inc., 276 F. Supp. 2d at 1249. The Act permits reliance on the ILLR model "set forth by the [FCC] . . . as that model may be amended by the Commission over time . . . to increase the accuracy of that model." 17 U.S.C. § 119(a)(2)(B)(ii)(I).

ILLR vendors, of which EchoStar always chooses the vendor that designates a subscriber as unserved whenever there is a discrepency, was, and continues to be, unlawful.

The court also found that "EchoStar has not met its burden in showing that any of its distant signal subscribers meet the grandfathering requirements," of section 119(e). Id. at 1250. As previously indicated, to be eligible for grandfather status, a subscriber must (1) have been a subscriber on October 31, 1999 or have had distant network service terminated pursuant to the Act between July 11, 1998 and October 31, 1999 and (2) receive a signal of less than Grade A intensity. 17 U.S.C. § 119(e). EchoStar presented no evidence that its putative grandfathered subscribers receive a signal of less than Grade A intensity, nor a list of subscribers as of October 31, 1999 or a list of subscribers terminated, for Act compliance reasons, between July 11, 1998 and October 31, 1999. More importantly, EchoStar did present testimony that it does not have a list of its subscribers as of October 31, 1999. CBS Broad., Inc., 276 F. Supp. 2d at 1251. Thus, because EchoStar had not demonstrated that any of its subscribers were eligible for grandfather status, and conceded that it did not have the data necessary to ever so prove, the court refused to acknowledge any alleged grandfather subscribers as eligible, id. at 1251-52, and held that "EchoStar subscribers are no longer entitled

to grandfather status," id. at 1257.[21]

Finally, the district court concluded that EchoStar "failed to prove that any of its subscribers are eligible because they have obtained waivers from the relevant network stations," pursuant to 17 U.S.C. § 119(a)(14). Id. at 1252. EchoStar again made use of its "DMA Rule" in this context and only sought waivers from stations in a subscriber's DMA. Because EchoStar did not consider subscribers who received Grade B or stronger signals from stations outside the subscribers' DMA to be served, they did not seek waivers from those stations. The court, however, concluded that "[f]or a particular household to have a valid wavier with respect to a particular network, it is necessary to obtain a waiver from every station affiliated with that network that the ILLR model predicts to deliver a Grade B signal to the household." Id. Thus, because EchoStar did not present evidence that it had obtained waivers from all relevant stations, the court held that EchoStar did not carry its burden of proving that any of its subscribers were unserved on account of valid waivers. Id.

---

[21] As part of its discussion, the court concluded that eligibility for grandfather status depends upon the strength of signal a subscriber currently receives, not the strength of signal received on October 31, 1999. CBS Broad., Inc., 276 F. Supp. 2d at 1251. In other words, eligibility for grandfather status can change over time as the signal strength a household receives changes. We believe that this is the correct interpretation of the statutory language and is consistent with our conclusion, discussed infra, that the Act imposes a requirement of continual subscriber eligibility based on the strength of network signal that a given household receives.

As a result of these findings, the district court concluded that EchoStar's conduct and failure to satisfy its statutory burden amounted to a "willful or repeated" copyright infringement, which was actionable pursuant to 17 U.S.C. § 119(a)(7)(A). Id. at 1253.[22] The court declined, however, to find that EchoStar engaged in a "pattern or practice" of violations. According to the Act, upon such a finding, "the court shall order a permanent injunction" barring the satellite carrier from providing distant network service of any network station affiliated with the infringed-upon network. 17 U.S.C. § 119(a)(7)(B)(i). The court did not find it necessary to determine conclusively whether EchoStar had ever engaged in a "pattern or practice" of violations, because "no such pattern or practice currently exists which would warrant such an extreme sanction." Id. at 1254. Accordingly, the court crafted an injunction designed to remedy the willful or repeated individual violations of the Act. Id. at 1255-58.

---

[22] The district court found that EchoStar's action constituted "willful or repeated" violations under two interpretations of "willful or repeated." The court first noted that "[i]n order to prove willfulness, 'it is necessary only to show that a person knew it was doing the acts in question, not that the person knew those acts were wrong.'" CBS Broad. Inc., 276 F. Supp. 2d at 1253 (quoting CBS Broad., Inc., 48 F. Supp. 2d at 1356). The court also found that EchoStar had acted willfully under a gross negligence standard for willfulness. Id. EchoStar did not challenge either interpretation and we therefore need not resolve the issue here. We pause only to note that the strict-liability-like former definition may be inconsistent with our prior opinion in which we referred to a "willful desire to avoid compliance," EchoStar I, 265 F.3d at 1204. Regardless, we are confident that the record demonstrates that EchoStar knew what it was doing and knew it was not in compliance with the Act.

III.

Both EchoStar and plaintiffs appealed. We address EchoStar's appeal before moving on to the plaintiffs' claim that Echostar engaged in a "pattern or practice" of violations and, as a result, the district court was obligated by the statute to issue a permanent, nationwide injunction. We review the district court's findings of fact for clear error and its interpretation of the SHVA de novo. See U.S. v. Pistone, 177 F.3d 957, 958 (11th Cir. 1999) ("The interpretation of a statute is a question of law subject to de novo review."); Fed. R. Civ. P. 52(a) ("In all actions tried upon the facts without a jury or with an advisory jury . . . [f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.").[23]

A.

In this appeal, EchoStar has alleged a staggering seventeen claims of error.[24]

---

[23] The district court relied upon the testimony of the networks' expert witness, Jules Cohen, throughout its Findings of Fact and Conclusions of law, and specifically questioned the credibility of EchoStar's expert witness, see CBS Broad., Inc., 276 F. Supp. 2d at 1244, 1252 n.10. Because "[a]ppellate courts reviewing a cold record give particular deference to credibility determinations of a fact-finder who had the opportunity to see live testimony," Owens v. Wainwright, 698 F.2d 1111, 1113 (11th Cir. 1983), we do not second guess the court's judgments.

[24] In EchoStar's opening brief, these claims are sometimes clearly correlated to section headings, and other times they are overlapping and/or only tangentially mentioned in the course of discussing another alleged error and left for this court to discover and evaluate.

22

Despite EchoStar's apparent characterization of the trial as one of gross mismanagement, utter incompetence, and widespread chaos, we find the district court's orders and opinions to be generally thoughtful, careful, and well-reasoned. We applaud the court's efforts in dealing with a complicated, technical matter – oftentimes in spite of, rather than with the aid of, defendant's cooperation. We find the vast majority of EchoStar's claims to be completely without merit and address those briefly in the margin.[25]

---

[25] EchoStar contends that the district court erred by "entering an overly broad permanent injunction," because the court ruled that none of EchoStar's subscribers had valid waivers and none were properly considered "grandfathered" or could ever be considered "grandfathered." See CBS Broad., Inc., 276 F. Supp. 2d at 1257. The scope of an injunction is reviewed for abuse of discretion. Simmons v. Conger, 86 F.3d 1080, 1085 (11th Cir. 1996). As we discuss, infra, we agree with the district court's conclusion that the "DMA Rule" is inconsistent with the Act, and therefore EchoStar has not carried its burden of proving that any of its subscribers have valid waivers from all the necessary network stations. EchoStar also claims that the injunctive requirement of a "written waiver" is infeasible given electronic record-keeping and the possibility of waiver-by-failure-to-respond. Neither we, nor plaintiffs, read into the court's injunction an inflexibility that would make it inconsistent with those realities.

With respect to grandfathered subscribers, because EchoStar failed to provide any evidence that any of its subscribers met any of the criteria for grandfathered status, and represented that it did not have the data to do so, the district court committed no error in concluding that none of the subscribers were or could ever be demonstrated to be grandfathered. EchoStar attempts to counter by suggesting that "it is literally impossible that not one of EchoStar['s] subscribers is 'grandfathered.'" Appellant's Reply Brief at 12. The argument is too clever by half. EchoStar seems to overlook the fact that it simply does not matter whether this is true; EchoStar, not the networks, and certainly not the court, have the burden of demonstrating that any given subscriber is grandfathered. Accordingly, we cannot say that the district court abused its discretion in crafting the injunction.

EchoStar makes a related argument that, by denying subscribers their duly-earned grandfathered status, the court deprived them of their property without due process of law. EchoStar relies primarily on language in EchoStar I, that "[e]ligibility [for grandfathered status] belongs to the subscriber, and nothing is said in the statute about carriers." 265 F.3d at 1212. Even assuming that this language vests in subscribers a property interest for which they are entitled to due process, it is certainly not a right to receive service from EchoStar. EchoStar's

23

current subscribers are free to seek grandfathered eligibility from another satellite carrier so long as it can be proven that they qualify. We therefore reject EchoStar's constitutional argument.

EchoStar further maintains that the district court erred by admitting Jules Cohen's testimony in violation of Fed. R. Evid. 702 because his testimony was based on ILLR analyses performed by Decisionmark. A trial court's decision to admit expert testimony is reviewed for abuse of discretion. A.A. Profiles, Inc. v. City of Fort Lauderdale, 253 F.3d 576, 581 (11th 2001). EchoStar does not contest that Cohen was qualified as an expert. Fed. R. Evid. 703 provides that if "facts or data in the particular case upon which an expert bases an opinion or inference" are "of a type reasonably relied upon by experts in the particular field," then "the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." We cannot say that the district court abused its discretion in determining that it was reasonable for Cohen to rely on Decisionmark's model output as the basis for his testimony.

EchoStar also claims that the court erred by not requiring the networks to prove irreparable harm before entering a permanent injunction. Under the Copyright Act, however, a plaintiff need not show irreparable harm in order to obtain a permanent injunction, so long as there is past infringement and a likelihood of future infringement. See Pac. & S. Co. v. Duncan, 744 F.2d 1490, 1499 (11th Cir. 1984). Moreover, the district court did find that the networks demonstrated harm due to EchoStar's delivery of illegal distant network programming to served households, because the number of viewers attributed to a particular television station determines the price it can charge advertisers. If a Nielsen household receives a network from a different city, then that household will not be counted as a viewer of the local network affiliate, causing harm to that affiliate.

EchoStar further argues that the district court prejudiced EchoStar by denying critical discovery and refusing to continue the trial, despite numerous discovery motions remaining pending until the eve of trial. Discovery rulings will not be disturbed absent an abuse of discretion and substantial harm to the party seeking relief. See Arabian Am. Oil Co. v. Scarfone, 939 F.2d 1472, 1477 (11th Cir. 1991). We do not find that the court's discovery rulings and scheduling decisions were abuses of discretion that substantially harmed EchoStar.

EchoStar also claims that the district court erred by finding that the networks had proven their ownership of the copyrights in question, and by entering a nationwide permanent injunction based on television programs which aired before EchoStar provided distant network programming. This argument is meritless. In its opinion vacating the preliminary injunction, this court stated that "[t]he Networks own the copyright or exclusive rights in numerous television programs broadcast by CBS, Fox, ABC, and NBC network stations." EchoStar I, 265 F.3d at 1196. The district court did not err by reaching the same conclusion on remand. We also agree with the district court's March 31, 2003 Order addressing this argument.

EchoStar next argues that the Affiliate Associations do not have standing to bring this action. Individual affiliate stations have standing pursuant to 17 U.S.C. § 501(e). We agree with the district court that the Affiliate Associations meet the requirements for representational standing under Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977).

EchoStar also asserts that the court erred by granting summary judgment on EchoStar's

24

## 1. EchoStar's ILLR Methodology

EchoStar claims that the district court erred in its interpretation of the Act and its application to three components of EchoStar's ILLR methodology. Although we reject Echostar's first two arguments, we agree that the Act does not proscribe the use of multiple vendors. Because this determination has no bearing on EchoStar's failure to carry its statutory burden of proof, it does not impact the ultimate disposition of this case.

### a. "DMA Rule"

EchoStar claims that, contrary to the district court's determination, the Act

---

counterclaims, see supra note 18. In reviewing a district court's grant of summary judgment, we view the evidence in the light most favorable to the non-moving party. See Chapman v. Am. Cyanamid Co., 861 F.2d 1515, 1518 (11th Cir. 1988). "Where the circumstantial evidence and reasonable inferences drawn therefrom create a genuine issue of material fact for trial, summary judgment is improper. Id. at 1518-19. "However, an inference based on speculation and conjecture is not reasonable." Id. at 1518. We agree with the district court that the evidence presented by EchoStar, purportedly establishing intent and harm was "nothing more than speculation" and "mere belief." As such, no trier-of-fact, based on the evidence presented and the reasonable inferences that could be drawn therefrom, could find that EchoStar made out a claim for tortious interference, unfair competition, or a conspiracy to commit either. Nor does EchoStar point to any outstanding discovery requests that would have produced any evidence capable of altering this conclusion.

Lastly, EchoStar claims that the district court erred in striking EchoStar's jury trial demand days before trial. There is no right to a jury trial, however, when the plaintiffs seek purely equitable relief such as an injunction. See Ford v. Citizens & S. Nat'l Bank, 928 F.2d 1118, 1121-22 (11th Cir. 1991). A request for attorney's fees does not change that result. See Whiting v. Jackson State Univ., 616 F.2d 116, 122 n.3 (5th Cir. 1980). It therefore was not reversible error for the district court to strike EchoStar's demand.

endorses the "DMA Rule."[26]  Thus, EchoStar contends that so long as the network

station in a household's Nielsen-defined DMA does not provide a Grade B or

better signal, the household is properly considered unserved.  The district court

concluded, however, that if a household receives any signal of Grade B or better,

regardless of its source, the household is served with respect to that network.  We

agree with the district court's interpretation of the Act.

The Act defines "unserved household" with respect to a given network as

one that "cannot receive . . . an over-the-air signal of a primary network station

affiliated with that network of Grade B intensity."  17 U.S.C. § 119(d)(10)(A)

(emphasis added).  The definition is not limited to "the primary network station in

the household's DMA."  It refers to the signal of any network station.  The plain

meaning of the statute is not altered by EchoStar's oblique reference to 17 U.S.C.

§ 122(j)(2)'s definition of "local market," which is somehow supposed to shed

light on the meaning of "local service area" as used in 17 U.S.C. § 501(e).  Not

only is this end-around unconvincing, it is unnecessary given the clear language of

---

[26] Relatedly, EchoStar claims that if the Act prohibits the "DMA Rule," it "improperly expands the affiliates' contractual rights."  Appellants Brief at 33.  This argument is bewildering.  Even if it is factually correct, we have difficulty understanding why Congress is not free to define the scope of EchoStar's statutory right.  Evidently, according to EchoStar, it is perfectly legitimate for Congress to constrict any contractual right the affiliate may have had by granting satellite carriers a statutory license, but an expansion of anyone else's right is wholly inappropriate.  We disagree.

the statute.  Thus, we agree with the district court that EchoStar's use of the "DMA Rule" was in violation of the Act.

## b. Use of Interference

EchoStar also objects to the district court's conclusion that the use of interference in the ILLR model was improper after May 2000.  We agree with the district court's resolution of this issue.  As the court noted, in May 2000, the FCC issued a First Report and Order that made modifications to the ILLR model and provided a step-by-step "cookbook" describing how the model was supposed to be run.  A prior "cookbook" had included interference, but the May 2000 and July 2002 "cookbooks" specifically and clearly omitted it.  After the SHVIA amendment, the Act permits use of the ILLR model "set forth by the [FCC] . . . , as that model may be amended by the Commission . . . to increase the accuracy of that model." 17 U.S.C. § 119(a)(2)(B)(ii)(I).[27]  Accordingly, the use of any ILLR

---

[27] In its reply brief, EchoStar contends that removing interference from the ILLR model is beyond the scope of the FCC's authority.  The argument runs as follows: because the Act only permits the FCC to improve the accuracy of the model, and removing interference unequivocally worsens the accuracy of the model, the FCC action was ultra vires, and should be invalidated pursuant to Chevron U.S.A., Inc. v. Natural Res. Defendant. Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).  This distinct administrative law issue was not raised in EchoStar's initial brief and is therefore waived.  Moreover, even if the argument had not been waived, EchoStar points us to nowhere in the record where this issue was specifically raised and litigated.  Absent an exhaustive bench trial and considering the deference due to administrative agencies in the conduct of their technological expertise, we would be extremely reluctant to determine that it was plain error to conclude that the FCC acted within the scope of its authority.

method that does not comply with the specific procedures the FCC establishes for the model cannot be said to conform to the Act's requirements. Therefore, because EchoStar's model included interference and thereby did not conform to the FCC's specifications, it did not comply with the Act and the district court could have determined that the non-compliant model provided no presumptive evidence of eligibility.

### c. Use of Two Vendors

EchoStar claims that it was error to hold that the Act prohibits the use of multiple ILLR vendors in assessing subscriber eligibility. The district court concluded that "EchoStar could have chosen either of these two competent vendors to check the ILLR status of its subscribers," CBS Broad., Inc., 276 F. Supp. 2d at 1250, but because EchoStar used both vendors to exploit inconsistencies between the two, it acted unlawfully. We find nothing in the Act to support this conclusion. The statute provides that "[i]n determining presumptively whether a person resides in an unserved household . . . , a court shall rely on the [ILLR] model set forth by the [FCC]." 17 U.S.C. § 119(a)(2)(B)(ii)(I). So long as a satellite carrier uses vendors whose models comply with the FCC's ILLR guidelines, the carrier may utilize as many different vendors as it would like. We note, however, that the ILLR model is only a

presumptive determination of eligibility, and the satellite carrier bears the ultimate

burden of proving that a household is unserved.  Unless there is evidence that one

model is more accurate than another – which, in this case, EchoStar's witnesses

did not suggest – and the models produce conflicting results, it would be difficult

to conclude that a satellite carrier has satisfied its burden of proof.  In such

circumstances it would likely be necessary to obtain an accurate measurement

pursuant to section 119(a)(2)(B)(ii)(II) to demonstrate subscriber eligibility.[28]

Thus, while EchoStar's use of two ILLR vendors may negatively affect its ability

to satisfy its burden, it is not necessarily unlawful to do so.

### 2. Retroactive Application and Present Eligibility

Finally, EchoStar argues that SHVIA's ILLR provisions either do not apply

retroactively to customers signed up before SHVIA was passed, or if they do apply

retroactively, do so in violation of the Fifth and Fourteenth Amendments of the

United States Constitution.  Relatedly, EchoStar argues that the district court erred

by interpreting the Act "to imply an obligation upon satellite carriers to constantly

---

[28] In this regard, we find it hard to believe that EchoStar could benefit by using two vendors aside from being alerted to households for which EchoStar might want to conduct an on-site measurement.  Utilizing a second vendor will not likely provide the necessary proof that a household, deemed served by the first vendor, is presumptively unserved.  Moreover, inconsistencies between the vendors could possibly force the court to question whether a household, which would have been presumptively unserved based on the first vendor alone, should be considered presumptively unserved.

re-test and re-qualify subscribers each time" the model changes or the model input, such as station power or antenna direction, changes. We address these arguments separately.

EchoStar contends that any requirement that it qualify its subscribers by an ILLR model cannot be applied to subscribers who signed up prior to the incorporation of the ILLR provisions into the Act. So applying the SHVIA amendment, according to EchoStar, would be unconstitutionally retroactive. We do not see how this could possibly be so. Neither the Act nor the district court's opinion imposes any requirement that EchoStar ever use an ILLR model in any way. All the Act requires – and has ever required – is that EchoStar subscribers be unserved. The definition of an "unserved household" was originally, and continues to be, a household that "cannot receive, through the use of a conventional outdoor rooftop receiving antenna, an over-the-air signal of grade B intensity (as defined by the Federal Communications Commission) of a primary network station affiliated with that network." Pub. L. No. 100-667, tit. II, § 202, 102 Stat. 3935, 3957; 17 U.S.C. § 119(d)(10)(A). Prior to the SHVIA amendments, courts may or may not have regarded ILLR results as presumptive indications of signal strength. The amendment simply made that presumption clear. But the touchstone of eligibility has always been whether a given household

actually receives a Grade B or stronger network signal. By incorporating the ILLR into the Act, Congress gave satellite carriers a relatively cheap and convenient method of presumptively establishing eligibility. It allowed the satellite carriers to satisfy its burden of proof – which could then be rebutted if the network station performed an actual measurement – without on-site testing at every household. To the extent the ILLR model exposed households that were previously considered unserved, as served, those households were never <u>actually</u> entitled to service. As such, SHVIA did not apply a retroactive obligation on satellite carriers. Rather it provided an evidentiary tool to enable the carriers to prove what it was always required to prove.

EchoStar raises a related but distinct concern: it does not believe that the Act imposes an obligation to re-test and re-qualify subscribers once they have already been qualified.[29] According to Echostar, so long as a subscriber is eligible (apparently, presumptively or actually) upon sign-up, the subscriber is always and

_____

[29] EchoStar believes this is the consequence of interpreting the SHVIA ILLR amendments to apply "retroactively." As we discussed, we do not believe SHVIA imposed any new requirement on the satellite carrier and therefore cannot be said to have required carriers to re-test and re-qualify existing subscribers. Because the argument is phrased in terms of re-testing upon changes in station power and antenna direction, however, we interpret the argument as an objection to an on-going qualification requirement. In other words, changes in inputs such as signal strength can affect whether the ILLR model presumptively establishes eligibility, and whether a given household is, in fact, served. EchoStar argues that it is only obligated to demonstrate eligibility at sign-up regardless of any changes in conditions that might affect that determination.

forever eligible. We do not interpret the Act to impose such a one-time-only requirement. To begin, we note that the Act is drafted in the present tense, without qualification; it limits the license to transmissions "to persons who <u>reside</u> in unserved households." 17 U.S.C. § 119(a)(2)(B)(i) (emphasis added); <u>see also</u> <u>id.</u> § 119(a)(2)(B)(ii)(I) (prescribing use of ILLR model to "determin[e] presumptively whether a person <u>resides</u> in an unserved household" (emphasis added)); <u>id.</u> § 119(a)(2)(B)(ii)(II) (providing for use of on-site measurements "to determine whether a person <u>resides</u> in an unserved household" (emphasis added)). The clear indication is that a person must <u>always reside</u> in an unserved household, not just initially.

We recognize the possibility, however, that a person can be said to be "residing" in an unserved household, regardless of current conditions, if a household were deemed forever "unserved" so long as it met the eligibility requirements at sign-up. We therefore look to the definition of "unserved household." All three relevant definitions refer to present criteria: either a household that (1) "<u>cannot</u> receive" a Grade B signal; (2) "<u>is</u> subject to a waiver;" or (3) "<u>does not receive</u> a signal of Grade A intensity" and otherwise qualifies for grandfathered status. <u>Id.</u> § 119(d)(10) (emphasis added). None of these definitions refer to sign-up, despite the ease with which Congress could have

32

included such a qualification if that had been its intention.

We also note, moreover, that there is no requirement that network stations challenge a subscriber at the time of sign-up or any specified period of time thereafter. EchoStar's interpretation, however, would either transform the ILLR model into de facto conclusive evidence of eligibility (because it would be difficult to rebut the presumption with an actual measurement done at a later time if eligibility referred only to eligibility at sign-up) or force networks to perform on-site measurements for every subscriber at the time of sign-up – the latter being a requirement that appears nowhere in the Act. Accordingly we conclude that the Act imposes a requirement that a household is presently unserved, not solely unserved at sign-up as EchoStar suggests.

### 3. Summary

Of EchoStar's seventeen claims of error, we find that only the district court's determination that the Act proscribes the use of multiple ILLR vendors to be incorrect. Because we do not believe this decision had any effect on EchoStar's inability to demonstrate that it has not willfully or repeatedly infringed upon plaintiffs' copyright – nor, as we discuss, infra, on our determination that EchoStar engaged in a "pattern or practice" of violations – we do not need to remand for any reconsideration in light of this conclusion.

Before we move on to plaintiffs' cross-appeal, we pause to briefly comment on defendant's approach. While it is not normally the place for courts to second guess the strategic decisions of counsel, we do note that, here, EchoStar may have been better served by focusing on and developing its serious objections as opposed to its scattershot approach which ultimately wasted limited space on patently unmeritorious claims of error.

B.

Plaintiffs also appealed, challenging the district court's conclusion that, because EchoStar is not currently engaging in a "pattern or practice" of violations, it was not obligated to issue a nationwide permanent injunction prescribed by the statute.[30] EchoStar contends that the district court's ruling was permissible because the court retained a measure of discretion not to issue the permanent injunction despite the mandatory language in the statute. EchoStar also suggests that the remedy does not apply so long as it is not currently engaging in a "pattern or practice" of violations. We disagree with both contentions. Because we come to the inescapable conclusion, based on the district court's findings, that EchoStar

---

[30] The district court's findings of fact and conclusions of law dealt with all of EchoStar's subscribers throughout the United States. Thus, any violations are on a "substantially nationwide" scale rather than "local or regional" indicating that, to the extent 17 U.S.C. § 119(a)(7)(B) comes into play, it is through subsection (i) rather than (ii).

34

did engage in a "pattern or practice" of violations, we find that the district court erred in not entering a permanent injunction.

### 1. Requirements for "Pattern or Practice" Liability

According to the Act:

> If a satellite carrier engages in a willful or repeated pattern or practice of delivering a primary transmission made by a network station . . . to subscribers who are not eligible to receive the transmission . . . , then . . . if the pattern or practice has been carried out on a substantially nationwide basis, the court shall order a permanent injunction barring the secondary transmission by the satellite carrier, for private home viewing, of the primary transmissions of any primary network station affiliated with the same network . . . .

17 U.S.C. § 119(a)(7)(B)(i). The Act itself provides no further explanation as to what constitutes a "pattern or practice," except to indicate that it can occur on a nationwide, regional, or local scale. See id. at §§ 119(a)(7)(B)(i), (ii). We find some guidance, however, in the legislative history of the Act:

> It is not the intent of this statute to subject a satellite carrier to "pattern or practice" liability as a result of good faith mistakes, provided that the carrier is reasonably diligent in avoiding and correcting violations through an internal compliance program that includes methods of confirmation of household eligibility . . . .
>     In view of the possibilities for error which would occur despite reasonably diligent efforts to avoid them . . . , it is the intent of this statute that no pattern or practice be found if . . . less than 20% of the subscribers to a particular network station (on either local, regional, or national bases) are found ineligible.

H.R. Rep. No. 100-887(I), at 19 (1988), reprinted in 1988 U.S.C.C.A.N. 5577,

35

5622; see also CBS Broad. v. PrimeTime 24 Joint Venture, 48 F. Supp. 2d 1342, 1357 (S.D. Fla. 1998). Thus, while the statute itself does not automatically impose "pattern or practice" liability where the 20% threshold is met, nor does it preclude a finding of "pattern or practice" where the threshold is not reached, we believe the 20% ineligibility proportion to be a relevant marker for "pattern or practice" analysis.

EchoStar would have us forgo even this preliminary inquiry of whether a "pattern or practice" ever existed, because the district court found that "no . . . pattern or practice currently exists," CBS Broad. Inc., 276 F. Supp. 2d at 1254, and it reads the Act to impose a requirement of an ongoing "pattern or practice" before section 119(a)(7)(B)(i) is triggered. It reads the statutory language, "[i]f a satellite carrier engages in a willful or repeated pattern or practice," 17 U.S.C. § 119(a)(7)(B) (emphasis added), as foreclosing application of the section so long as a satellite carrier ceases (most of) its illegal activity, presumably anytime before the close of trial. We do not believe this is the best reading of the statute. Rather than imposing an obligation on the networks to identify violations, bring suit, conduct discovery, and complete a full trial, all before the satellite carrier decides to become SHVA compliant, we read the statute as imposing liability "[i]f a satellite carrier [ever] engages in a willful or repeated pattern or practice" of

36

statutory violations.  Id.  The moment a satellite carrier engages in what can be said to be a "pattern or practice" of violations, it makes itself eligible for the specified remedy, regardless of when it is found to have been doing so.  Cf., e.g., 18 U.S.C. § 1621 (indicating that the crime for perjury occurs where a duly sworn individual "states or subscribes any material matter which he does not believe to be true" but not requiring a defendant to be "stat[ing] or "subscrib[ing]" at the time of his perjury trial).

We also note that there is no requirement that a court find that the satellite carrier engage in a "pattern or practice" of actually providing distant network service to served households.  This is again a function of the statutory burden of proof.  While we do not find it particularly intuitive to think of a satellite carrier as engaging in "pattern or practice" of failing to prove that its subscribers are unserved, we have but little choice.  The statute specifically mandates that "[i]n any action brought under this paragraph," the satellite carrier has the burden of proof.  Id. § 119(a)(7)(D) (emphasis added).  A requirement that a satellite carrier actually engaged in a "pattern or practice" of serving served households is inconsistent with that burden allocation.  Accordingly, we presume, for the purpose of evaluating "pattern or practice" liability, that a finding that a satellite carrier failed to carry its burden of establishing eligibility is tantamount to a

finding of ineligibility. Section 119(a)(7)(B) liability is triggered whenever a satellite carrier fails to carry its burden of proving eligibility on a sufficient scale, and to a sufficient degree, that we can presume that the satellite carrier is engaging in "pattern or practice" of serving ineligible subscribers.

### 2. Did EchoStar Engage in a "Pattern or Practice"?

Based on these guidelines, we now must determine if EchoStar ever engaged in a "pattern or practice" of statutory violations. Because the district court found EchoStar's current practices to be substantially compliant, it did not believe it necessary to determine if EchoStar's prior conduct constituted a "pattern or practice" of violations. See CBS Broad., Inc., 276 F. Supp. 2d at 1254. Ordinarily we would remand to the district court to make this determination in the first instance. We believe, however, that there is no other possible conclusion that can be drawn from the district court's findings of fact.

We first note the length of time over which the district court found EchoStar to be using inadequate procedures for assessing subscriber eligibility. When EchoStar first began offering its own distant network packages in July 1998, it utilized the red-light/green-light method – a method for which the district court found "no evidence [that would indicate that it] was reasonably calculated to prevent signups of ineligible subscribers." Id. at 1241. Even after EchoStar

38

switched to the ILLR model, it utilized the illegitimate "DMA Rule" through October 2000, and unlawfully considered "interference" from at least August 2000 through January 2002. In other words, at no point from when EchoStar began offering distant network programming through January 2002 did it use a compliance method capable of reliably assessing subscriber eligibility.[31]

This three-and-half year period of unlawful eligibility screening predictably led to a sizeable number of subscribers for whom EchoStar was unable to establish eligibility. We start with the ILLR analysis of EchoStar's April 2002 subscriber list. The best case scenario, which takes as valid EchoStar's claims of waivers and grandfathered status (the same ones for which district court found EchoStar failed to carry its burden of establishing), indicates that, on a nationwide basis, EchoStar is presumptively providing illegal service to 26.5% of its subscribers receiving ABC distant network programming, 26.9% for CBS, 20.2% for Fox, and 28.1% for NBC. Thus, even for the network with the lowest percentage of violations, factoring in claims of eligibility that the district court found not to have been established, EchoStar exceeds the 20% threshold on a nationwide basis. While we believe this may very well be sufficiently objectionable, we cull some

---

[31] This says nothing of the unlawful PrimeTime qualitative assessment that generated subscribers that EchoStar subsequently transferred to its own programming.

additional inflammatory conclusions from the district court's opinion: "The Court finds that EchoStar has failed to meet its burden of proving that its subscribers are 'unserved households.'" Id. at 1248; "EchoStar has failed to present any evidence . . . that any of its subscribers are unserved as defined under SHVA." Id. at 1253; "[T]he Court's [findings] support the conclusion that hundreds of thousands of EchoStar's distant network programming subscribers are not unserved households." Id. at 1249; "Plaintiff's evidence indicates that a significant percentage of EchoStar's distant network programming subscribers receive a signal of Grade B intensity or better." Id. at 1253; "Echostar has not met its burden in showing that any of its distant signal subscribers meet the grandfathering requirements." Id. at 1250; "EchoStar has also failed to prove that any of its subscribers are eligible because they have obtained waivers from the relevant network stations." Id. at 1252. If these findings do not describe a "pattern or practice" of violations, we do not know what does. Cf. ABC, Inc. v. PrimeTime 24 Joint Venture, 184 F.3d 348, 354 (4th Cir. 1999) ("Since PrimeTime could prove that virtually none of its thousands of subscribers in the Raleigh-Durham market was eligible for satellite service, the district court held – and we agree – that the carrier had engaged in a 'pattern or practice' of infringement.").

As if the magnitude of its ineligible subscriber base were insufficiently disconcerting, we have found no indication that EchoStar was ever interested in complying with the Act. Indeed, based on the district court's findings, we seem to have discerned a "pattern" and "practice" of violating the Act in every way imaginable. Whether it be overriding compliance determinations of ineligibility (more than 12,500 "red zone" subscribers per month), CBS Broad., Inc., 276 F. Supp. 2d at 1242; making pledges under oath to terminate ineligible subscribers and then failing to present any evidence that this corrective action was taken, id. at 1244-45; blatantly disregarding FCC alterations to the ILLR model after it was specifically put on notice of such changes, id. at 1250; or failing to disconnect subscribers it initially recognized to be ineligible for grandfather status based on an atextual "reinterpretation" of the statutory provision, id. at 1251; EchoStar has disregarded the limitations of its statutory license and sought to avoid its obligations under the Act at every turn. Accordingly, we have no trouble concluding that EchoStar has engaged in a nationwide "pattern or practice of delivering a primary transmission made by a network station . . . to subscribers who are not eligible to receive the transmission under this section." 17 U.S.C. § 119(a)(7)(B).

### 3. Mandatory Nature of the Remedy

The Act instructs that, upon a finding of a "pattern or practice" of violations, a "court shall order a permanent injunction barring the secondary transmission by the satellite carrier, for private home viewing, of the primary transmissions of any primary network station affiliated with the same network." 17 U.S.C. § 119(a)(7)(B)(i) (emphasis added).  Despite the facially mandatory nature of the provision, EchoStar argues that the district court had discretion to issue the injunction, and properly exercised that discretion in not issuing the injunction in this case.  In making this argument, EchoStar relies primarily on Hecht Co. v. Bowles, 321 U.S. 321, 64 S. Ct. 587, 88 L. Ed. 754 (1944), for the proposition that, if Congress is going to remove courts' traditional equitable discretion, "an unequivocal statement of its purpose would have been made."  321 U.S. at 329, 64 S. Ct. at 591; see also id. at 330, 64 S. Ct. 592 ("We do not believe that such a major departure from that long tradition as is here proposed should be lightly implied.").  We believe there are important differences between the statute in Hecht and the one before us that lead us to conclude that Congress removed courts' discretion upon a finding of a "pattern or practice" of violations.

The Hecht Court interpreted section 205(a) of the Emergency Price Control Act of 1942, 50 U.S.C. § 901 et seq., (repealed 1956), which provided that, upon finding of certain conditions, "a permanent or temporary injunction, restraining

42

order, or other order shall be granted without bond." The Court found statutory language ("or other order") and legislative history suggesting that Congress had not intended to remove courts' traditional equitable discretion. 321 U.S. at 328-29, 64 S. Ct. at 591. There is no ambiguous statutory language in the SHVA and we are unaware of any legislative history that would indicate that the remedial measure chosen by Congress is anything but mandatory. Cf. H.R. Rep. No. 106-464, at 94 (1999) (Conf. Rep.) ("The section 122 license contains remedial provisions parallel to those of Section 119, including a 'pattern or practice' provision that requires termination of the Section 122 statutory license as to a particular satellite carrier if it engages in certain abuses of the license." (emphasis added)). Moreover, section 119(a)(7)(B)(i) itself contemplates both mandatory and discretionary remedies: Upon the same finding of a "pattern or practice," "the court shall order a permanent injunction" whereas "the court may order statutory damages." 17 U.S.C. § 119(a)(7)(B)(i) (emphasis added). Absent evidence to the contrary, we presume that Congress understood what it was doing when it instructed courts to provide a specific remedy and permitted courts to provide another. Accordingly, we find that Congress unequivocally stated a purpose to restrict the courts' traditional equitable authority upon a finding of a "pattern or

practice." Accord ABC, Inc. 184 F.3d at 354-55.[32] Because, as discussed, we come to the unavoidable conclusion that EchoStar engaged in a "pattern or practice" of SHVA violations, we hold that the district court is required to issue a nationwide permanent injunction barring the provision of distant network programming pursuant to the Act's statutory license.

## IV.

For the foregoing reasons the judgment of the district court is AFFIRMED in part and REVERSED in part, and we REMAND the case to the district court for the entry of a nationwide permanent injunction as mandated by the Act.

SO ORDERED.

---

[32] This discussion is not altered by the Supreme Court's recent decision in Ebay, Inc. v. Mercexchange, L.L.C., No. 05-130 (2006). There the Court, in invalidating the Federal Circuit's "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances," id., slip op. at 2 (quoting MercExchange, L.L.C v. eBay, Inc., 401 F.3d 1323, 1339 (Fed. Cir. 2005)) (internal quotation marks omitted), specifically found that "[n]othing in the Patent Act indicates that Congress intended" a departure from traditional equitable principles, id., slip op. at 3. As discussed, we do find such congressional intent in the SHVA. Because the Court in Ebay said nothing of Congress's ability to remove unambiguously courts' traditional equitable discretion, the opinion has no bearing on this case.